## 12635.  CALLAWAY v. WYNNE.

HILL, J.  1. "The provision of the statute of frauds which requires that the promise to answer for the debt, default, or miscarriage of another must be in writing in order to bind the promisor does not include an original undertaking whereby a new promisor, for a valuable consideration, substitutes himself as the party who is to perform, and the original promisor is thereby released." *Williams* v. *Garrison,* 21 *Ga. App.* 44 (93 S. E. 510).

2. While the charge might have submitted to the jury the contentions of the defendant more completely and fully, there was no written request to charge; the instructions were sufficient, and the charge was not harmful for any the reason assigned.

3. There was evidence to support the verdict, and the court did not err in failing to grant a new trial.

*Judgment affirmed. Jenkins, P. J., concurs. Stephens, J., dissents.*

STEPHENS, J., dissenting.  To my mind only one inference can be drawn from either the allegations in the petition as amended or from the entire evidence, and that is that the obligation alleged to have been assumed by the defendant, Sam Callaway, to the plaintiff was to answer for the debt of Brantley Callaway, who was not released, and that such promise of the defendant, not being in writing, was within the statute of frauds, and therefore unenforceable.

DECIDED NOVEMBER 29, 1921.

Complaint; from Wilkes· superior court — Judge Shurley. May 28, 1921.

F. M. Wynne sued Sam Callaway for $945 and interest, and in his original petition alleged: The defendant's son Brantley

Callaway was indebted to plaintiff in the year 1919 in the sum of $1,953, which included the amounts of specified notes and accounts, and in December, 1919, the plaintiff went to Brantley Callaway's home, where he was working land of his father, and told them that these notes and accounts must be settled, and unless they were settled at once he would have to foreclose his papers and otherwise proceed by law to collect them; and Sam Callaway "told him and contracted with him that if he would not foreclose his papers and proceed by law to collect them, and leave the auto and mule [for which the plaintiff held notes] with his son, he would pay the said debts of his son;" and "with this assurance on the part of said Sam Callaway, who is solvent, his son, the said Brantley Callaway, being at that time in bad financial circumstances and worth very little more than the amount he was due plaintiff, he agreed to the same and left the property with [them], Sam Callaway agreeing to pay the said amounts;" that "after said last-mentioned date Brantley Callaway disposed of practically all of his cotton and had a serious accident to his automobile, considerably damaging the same, and otherwise disposed of and dissipated his property and petitioner's security for the debt;" that "after the said Brantley Callaway had thus dissipated and ruined said property, the Sam Callaway, when petitioner next saw him, refused to settle the notes and accounts as he had agreed, and gave as his reason the fact that this property had been dissipated and damaged and destroyed;" that "at the time said Sam Callaway agreed to pay these notes and accounts he could have collected every dollar due him by the said Brantley Callaway, as he had not even disposed of the property nor damaged the same, but, the said defendant claiming it would ruin said Brantley Callaway and seriously affect them both, and at the said defendant's instance and request and upon the agreement of the said Sam Callaway as above set out, defendant [?] consented to the same, the said Sam Callaway being amply solvent and able to pay the same."

By amendment it was alleged: Brantley Callaway was working a farm on Sam Callaway's land, and a part of what he owed plaintiff was for supplies and a mule furnished to work this land. When plaintiff stated that he would foreclose his liens unless paid at once, Sam Callaway urged plaintiff to leave the property

there on the land and not to foreclose his liens, " as it would ruin his son and materially harm him (Sam Callaway), as his son was working a part of his (Sam Callaway's) land and he would have to obtain other stock for him to work the land and would ruin him, and promised and agreed with plaintiff that if he would not foreclose on said property, but leave it there, he, said Sam Callaway, would pay said amounts then due plaintiff, and plaintiff would look to him for the same. Upon this promise and assurance of Sam Callaway, plaintiff did not foreclose his liens and left said property as he agreed, and fully carried out and performed his agreements and his part of said contract. . . A few days after this Sam Callaway came to Washington to see plaintiff and told him he was ready to pay the amounts as he had agreed, . . and would pay it the next time he came to town. Shortly after this, plaintiff met said Sam Callaway, . . and then for the first time said Sam Callaway told him that he would not pay the amounts as he had agreed, and gave as his reason for not doing so that his son had had a wreck with the automobile and materially damaged the same, and also that one of the mules had died since said time, and refused to carry out his promise, to plaintiff's hurt and damage as set out above."

The defendant demurred, on the grounds: (1) No cause of action is set out. (2) The alleged agreement of the defendant is an agreement to answer for the debt, default, or miscarriage of another, and is not alleged to be in writing. (3) The said agreement is without consideration, illegal, and void. (4) It is not alleged that the property was left, or what part was left, in the possession of the defendant. (5) It is not alleged that the defendant received, or disposed of, or derived any benefit from the property alleged to have belonged to Brantley Callaway, or is liable to plaintiff on account of this property. The demurrer was overruled, and to this ruling exceptions were taken. The defendant in his answer denied the allegations of the petition, and pleaded that the alleged agreement was not in writing, and, being an agreement to answer for the debt, default, or miscarriage of another, was void.

On the trial H. C. Jackson testified, that in December, 1919, he went to see Brantley and Sam Callaway for Mr. Wynne, with instructions to get the cotton, corn, cottonseed, mules, wagon,

and automobile, — everything there that Mr. Wynne had a mortgage on, and Sam Callaway, after a conversation with his son, asked the witness to "wait until tomorrow," and said "he would be down here and say what he would do about it." Mr. Wynne told the witness that "if Sam agreed to pay this, just to turn everything loose to him and let him go." Sam came to the witness the next day and "agreed to pay it." The witness asked him what he was going to do, and he said, "I am going to pay it if Mr. Wynne will give me a little time;" and the witness then said to him: "All right, Sam, just go ahead now and do as you please with everything there. Mr. Wynne won't have anything more to do with this stuff." The witness further testified: "Brantley was living on his father's (Sam's) land, . . working a part of this land, and was living within 100 yards of Sam's house. Mr. Wynne furnished the mules that he was working. He furnished them that year to make a crop. He owed this money for a part of it. . . I called Mr. Smith to hear what Sam said, and the reason we didn't settle that evening, it was after banking hours, and we couldn't get the papers to figure it out. . . He never gave me any written promise to pay me at all. That was all there was. . . One of the mules finally died and Mr. Wynne got the other mule, but never got it until I went there after that again and tried to get him to settle. . . Sam and Brantley Callaway were together at the time of this agreement with Mr. Wynne." Harry Smith testified that he heard in part the conversation between Jackson and Sam Callaway; that Jackson asked him (Smith) to witness what Sam said, and "repeated this trade he had made with Sam and that Sam had agreed to pay the debt owed by Brantley to Mr. Wynne, and Brantley [?] said, 'Yes, sir.' . . As to whether anything was said about Sam's standing for the debt, . . he said he would pay it." F. M. Wynne testified, that Brantley Callaway owed him the amounts represented by "those notes," and other amounts, as set out in the petition, and that he got Mr. Jackson to see Brantley for him, and "about that time" Brantley and Sam "came in," and Sam said to him, "Brantley is my boy, and I just want you to let this matter go on, and I will pay you myself;" and he (Wynne) said, "I don't care to fool with Brantley Callaway any more; but I have the utmost confidence

in you, Sam, and if you care to pay this I will put this stuff in your charge, and you can pay me, and I will give you some time if necessary;" whereupon Sam asked if Wynne would allow him credit for "this cotton and stuff" on his note, when sold, and Wynne answered that he would. The witness further testified: "A few days after that, Sam and Brantley both came to town, . . and Sam said, 'Mr. Wynne, I am ready to pay you now.' . . The bank was closed and I couldn't get the notes, and I told Sam to pay it the next time he came to town. He hasn't carried out his trade. . . I met Sam in the street . . and said, 'Sam, what's the matter? Are you ready to pay me?' He told me, 'Boss, I just can't pay that money; that negro boy of mine just done treated me so bad I'm scared to pay it, scared I can't do nothing with it.' Brantley had been running about, drinking; . . he had neglected his stock, had turned them out in the weather; one of these mules, either from neglect or the weather, had died. Brantley had got on a spree and wrecked his automobile, and . . he had drawn money on two bales of cotton put in the warehouse. . . When Sam made this promise I kept the notes." The witness got the automobile back and disposed of it, and disposed of some of the cotton, and credited the account with what he got. The notes were introduced in evidence.

The defendant introduced in evidence the record of a dismissed suit of F. M. Wynne against Brantley Callaway, filed January 3, 1920, based on the notes attached to the petition in this case and on an open account; also the original petition in the case on trial and an amendment striking Brantley Callaway as a party defendant.

The trial resulted in a verdict against the defendant for the amount sued for.

*W. A. Slaton,* for plaintiff in error. *Colley & Colley,* contra.